```
                 IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                         AT CHARLESTON


_____x
                              :
UNITED STATES OF AMERICA,      :         Criminal Action
                              :
              Plaintiff,       :         No.  2:14-cr-00264-1
                              :
v.                            :
                              :         Date:  February 11, 2016
DENNIS P.  FARRELL,            :
                              :
              Defendant.   :
_____x


            PARTIAL TRANSCRIPT OF SENTENCING HEARING HELD
           BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
                  UNITED STATES DISTRICT COURT
                  IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:        AUSA PHILIP H. WRIGHT
                           AUSA LARRY R. ELLIS
                           AUSA ERIC P. BACAJ
                           U.S. Attorney's Office
                           P.O. Box 1713
                           Charleston, WV  25326-1713


For the Defendant:         MICHAEL W. CAREY, ESQ.
                           S. BENJAMIN BRYANT, ESQ.
                           Carey Scott Douglas & Kessler
                           P. O. Box 913
                           Charleston, WV 25323



Probation Officer:         Matthew Lambert


Court Reporter:            Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

**INDEX**

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | EXAMINATION |
|---|---|---|---|---|---|
| None | | | | | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | EXAMINATION |
|---|---|---|---|---|---|
| None | | | | | |

| GOVERNMENT'S EXHIBITS | ADMITTED |
|---|---|
| 1 | 33 |

| DEFENDANT'S EXHIBITS | ADMITTED |
|---|---|
| 1 | 59 |
| 2 | 59 |
| 3 | 59 |

1        PROCEEDINGS had before The Honorable Thomas E. Johnston,

2   Judge, United States District Court, Southern District of West

3   Virginia, in Charleston, West Virginia, on February 11, 2016, at

4   2:00 p.m., as follows:

5        COURTROOM DEPUTY CLERK:  The matter before the Court is

6   the United States of America versus Dennis Farrell, criminal

7   action number 2:14-cr-00264-1, scheduled for sentencing.

8        THE COURT:  Good afternoon.  Will counsel please note

9   their appearances?

10        MR. WRIGHT:  Good afternoon, Your Honor.  Philip

11   Wright, Larry Ellis, and Eric Bacaj on behalf of the United

12   States.

13        MR. CAREY:  Good afternoon, Your Honor.  Mike Carey and

14   Ben Bryant on behalf of the defendant, Dennis Farrell, who is

15   present in the courtroom.

16        THE COURT:  Good afternoon.  Mr. Farrell, will you

17   please stand, and I will ask the deputy clerk to administer an

18   oath to you at this time.

19        COURTROOM DEPUTY CLERK:  Please raise your right hand.

20        **DENNIS FARRELL, DEFENDANT, SWORN**

21        THE COURT:  You may be seated.

22     Mr. Farrell, do you understand that you are now under oath

23   and you must tell the truth and, if you testify falsely, you may

24   face prosecution for perjury or for making a false statement?

25        THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Throughout the course of this hearing, if

2     there's anything that occurs that you don't understand, I want

3     you to feel free to speak up and seek clarification.

4        Also, if at any time you need to confer with your attorneys,

5     I'll be pleased to pause the proceedings to allow you to do so.

6     Do you understand all that?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  All right.  Mr. Carey, have you received

9     and read and reviewed with your client a copy of the most recent

10    edition of the Presentence Report?

11         MR. CAREY:  I have, Your Honor.

12         THE COURT:  And, Mr. Farrell, have you received and

13    read and reviewed with your counsel a copy of the most recent

14    edition of the Presentence Report?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  You all may remain seated unless I indicate

17    otherwise.

18         MR. CAREY:  Thank you, Your Honor.

19         THE COURT:  Has the Government received and reviewed a

20    copy of the Presentence Report?

21         MR. WRIGHT:  Yes, Your Honor.

22         THE COURT:  All right.  Mr. Carey, you've written

23    prolifically on this case.  Do we have any -- and I understand

24    most of what you've written in the way of the version of the

25    offense and the objections or factual clarifications you're just

1    trying to bring to the Court's attention and I've read all that

2    stuff.  Is there anything I really need to act on?

3          MR. CAREY:  I don't believe so, Your Honor, but two

4    points of clarification.  As the Court has recognized, prior to

5    the drafting of the Presentence Report, I sent a very lengthy

6    defendant's version of the offense with supporting documentation

7    in relation thereto.

8       When I received the draft, significant -- what I consider to

9    be significant portions of my letter weren't included and so, I

10   formed them both in the form of an objection and revised the

11   letter after meeting with Mr. Wright and indicated that except

12   for those things which he had noted as objecting to in the

13   Presentence Report, there was a general agreement about those

14   things.

15      When I met with Mr. Lambert, he indicated that they proposed

16   simply appending my letter and making reference to it from time

17   to time in the objections and I thought that was going to be done

18   up until about the day before when he said he was going to send

19   it under separate cover.  I would just ask that that letter of

20   January 19, 2016 be appended to and travels with the PSR wherever

21   it goes, in other words.

22          THE COURT:  Is there any objection?

23          MR. WRIGHT:  No, Your Honor.

24          THE COURT:  All right.  Just so we're clear, too, Mr.

25   Wright, and I really wasn't reading it from this perspective, but

1    I did read Mr. Carey's letter.  It's about 26 pages long.  He

2    indicates that the Government generally doesn't have a quarrel

3    with what's in it, although it seemed to me that there were some

4    points in there that you might not totally agree on.  Where

5    exactly does the Government stand on that?

6              MR. WRIGHT:  Your Honor, it was difficult to go through

7    that and say, should that be in the PSR?  Should that be in the

8    PSR?  Some of the statements were such-and-such or so-and-so said

9    something.  I don't necessarily dispute that so-and-so said

10   something, but I'm not sure that I agree that that actually is a

11   truthful statement, or that that is factually correct, or that it

12   is even relevant factually or legally today.  So, I didn't go

13   through it line by line.  And, so, where Mr. Carey says that

14   so-and-so says something, yeah, I agree that so-and-so said

15   something.

16             THE COURT:  So, I can't really read that as something

17   that the Government fully subscribes to?

18             MR. WRIGHT:  No, Your Honor, and it would be difficult

19   for me to go through that, the entire length of that letter, and

20   say this is okay to be in there and this is not; and this is okay

21   and this is not.

22             THE COURT:  Well, and I might be a step either ahead of

23   you or behind you on this, that I'm looking at it in terms of

24   just considering the facts, not so much of what goes into the

25   Presentence Report because that's a determination that the

```
1     probation officer makes before it gets to me.

2          But, you know, I read it as coming from the defendant's

3     standpoint and I know enough about this case to know that there

4     probably is quite a bit in that letter that you all probably

5     wouldn't quarrel with, but there are probably some things in

6     there that, in the end, don't really make that much of a

7     difference that you might not agree with.  For example, probably

8     the most obvious thing is this business of how the MCHM --

9     whether the MCHM, how much of it went under or through the wall

10    or, maybe, I think in the view of the Government, through cracks

11    in the pavement, in the floor, versus how much of it went through

12    the ground under the tank and ended up running along that

13    culvert.  I'm not so sure you all are in total agreement on those

14    two things, but in the end, they don't really matter because the

15    containment didn't work, right?

16               MR. WRIGHT:  I agree with that statement.

17               MR. CAREY:  We agree that, yes, in the end, the

18    containment didn't work.  It was relevant simply to judge the

19    role of this defendant in context of the whole case.

20               THE COURT:  I understand that.  And, largely, that went

21    to the business about the repairing of the riverbank sometime ago

22    that didn't happen.

23               MR. CAREY:  Yes, at which time they were going to

24    explore the cause of the water that was coming through the storm

25    pipe, which we believe is the primary channel.
```

1          THE COURT:  All right.  Well, I mean, I've read a lot of

2     stuff in this case, at this point, but I think I understand all

3     that.

4          All right then.  So, to the extent that -- again, I've read

5     and, to the extent possible, digested the information presented

6     by counsel.  I don't see that there are any live objections here

7     that need to be addressed.  So, to the extent that there are

8     objections pending, I will overrule them as moot.

9          Now, I do want to talk about a couple of things here, as

10    long as we're talking about the Presentence Report.  First of

11    all, and I meant to give you a heads up that this was coming, but

12    it's sort of basic.  Do the parties -- I've been looking at this

13    Refuse Act statute.  What's the parties' position on whether or

14    not there's actually a mandatory minimum here?

15          MR. WRIGHT:  Your Honor, we've discussed this, and we

16    believe that you don't have to impose incarceration on that

17    because of the word "or", "impose a fine or incarceration", but

18    if incarceration is imposed, then there is a mandatory minimum.

19          THE COURT:  All right.  I think Mr. Carey agrees with

20    that and I do, too, having looked closely at the statute, and I

21    have to say that, from the time of the plea until just in the

22    last couple days, I was under the impression there was a

23    mandatory minimum and I may have so advised him at the plea

24    hearing, but when you look at the statute and you see that "or"

25    there, I think, as long as a fine is imposed, incarceration is

 1     not required; but if incarceration is imposed, it has to be at

 2     least 30 days.  So, that's my reading of it.  I just wanted to

 3     make sure we're all on the same page on that.

 4         All right.  Let's talk about that both sides are arguing

 5     under the -- I forgot to bring out my guidelines -- but I'm

 6     pretty familiar with this one, at this point.  Both sides are

 7     arguing that the plus or minus 2 departures that the notes,

 8     comment notes to Guideline Section 2Q1.3 suggest as possibilities

 9     either upward or downward ought to apply to -- thank you -- to

10     these three enhancements.  Does anybody want to add anything on

11     that, to your written submissions?

12              MR. WRIGHT:  Your Honor, I would like to be heard.  I

13     think, if we're going to go through those, we believe there's

14     three offense characteristics that apply here and that would

15     specifically counteract or offset any finding that the guideline

16     overall should be brought down because of negligence and,

17     specifically, you've dealt with this in a previous case, but

18     reserving our right to argue for the application of a six-level

19     enhancement for ongoing, continuous, or repetitive discharge.

20              THE COURT:  Well, so you're suggesting that -- well, if

21     you're suggesting they're related, then I'll hear from -- we can

22     take up both issues at the same time, I guess is what I'm saying.

23     Both sides approach it from completely different directions,

24     obviously, arguing that the departures should go in different

25     directions, but under different legal theories or different

1  arguments.  So, I want to deal with both of these things and we

2  might as well deal with them together.  So, I will hear from you

3  on both points.

4          MR. WRIGHT:  And, Your Honor, we believe that the Base

5  Offense Level of VI should be applied, obviously, and then the

6  six-level enhancement under 2Q1.3(b)(1)(A) for -- and here's the

7  language:  "If the offense resulted in an ongoing, continuous, or

8  repetitive discharge, release, or emission of a pollutant into

9  the environment."

10      We provided the Court earlier, just prior to sentencing or

11  related to Mr. Tis that we incorporated by reference to our

12  argument, and it begins largely by language in the statute.  Just

13  as the word "or" is important to the penalty phase of the Refuse

14  Act, we believe the word "or" in the singular nature, as opposed

15  to the plural nature of these words, means something.

16      So, we have one offense here, a Refuse Act violation,

17  resulted in an -- a discharge.  That discharge was ongoing,

18  continuous and/or repetitive.  Certainly, on January 9th, the

19  MCHM discharged into the river and, on January 23rd, it was seen

20  discharging into the river, and on January 30th, it was

21  discharging at least into the ground into a pipe at that northern

22  end of the facility, if not the river, all of which would

23  constitute a discharge into the environment.

24      There's a case that I came upon yesterday, Your Honor, given

25  to me yesterday, and I didn't cite it to the Court in our earlier

memo, but *United States v. Perez*, 366 F.3d 1178, an 11th Circuit
case out of 2004, which essentially analyzed these two -- this
statute and the -- or this guideline in 2Q1.2 dealing with
hazardous materials said that these guidelines do not oppose any
additional requirements on the application of the enhancement
beyond those contained in the guideline itself.  It is not a --
worded in a way that provides discretion, it says, if this
happened, then increase the offense level by 6.  It does allow in
the commentary for a downward departure, but at least at the very
start, before you even get to the departure, our position is that
you have to -- the offense level has to include that six-level
increase enhancement for that specific offense characteristic.

So, all of those words have meaning.  The singular nature
and that fact that it is "or", it doesn't have to be more than
one offense and it doesn't have to be a repetitive discharge,
although we think it was or it would qualify, just a long
discharge.

Now, we also believe that the nature of the offense here is
such that any downward departure should be offset -- essentially,
don't do it.  That's our argument.  Don't make a downward
departure from this because of the nature of the offense.

And, what happened here is, when you have this ongoing,
continuous discharge of MCHM, it requires effort, expense and
time, resources, to deal with that.  They have to extend a boom.
They have to monitor that boom.  They hire a company to go out

 1    there and put these booms in the water.  Then they monitor them.

 2    They have manpower.  They have to monitor them and replace them

 3    if and when they become saturated.  That went on well into

 4    February of 2014.

 5        The discharge at the northern end, it is leaking down

 6    through a pipe.  That was uncovered because they had to dig a

 7    trench, essentially a cleanup or a containment trench to catch

 8    that, and they severed into a pipe at the northern end of the

 9    facility.

10        The resources involved with digging a trench and extending

11    it a number of yards into the property up through that northern

12    end of the facility is an indication of why, in this particular

13    case, no downward departure should be applied to that six-level

14    enhancement.

15             THE COURT:  I just want to clarify something.  I knew

16    that, at some point later on, they had been working and they

17    ruptured a pipe and there was some additional MCHM released at

18    that time and that got into the river.

19             MR. WRIGHT:  Your Honor, no one on January 30th went

20    down to the river and observed it.  When they cut in and severed

21    this pipe, they discovered that water was flowing through that

22    pipe and they took samples from that water.  The water extended

23    down the hillside or down the riverbank into what's been called

24    riprap, rocks and other substances.  No one followed it and then

25    observed it on January 30th into the river.

1       THE COURT:  But that would be in addition to the point

2    source discharge that occurred on the northern end right after

3    the leak?

4       MR. WRIGHT:  Yes, sir.  That was January 30th.  That

5    pipe is in the general area just up on the bank from the point

6    source at the northern end.  So, that may well have been the

7    source of the discharge that was seen on January 23rd.  It was

8    not seen in the river on January 30th.

9       THE COURT:  Okay.  Well, that's not really -- what I'm

10   getting at is, that's actually sort of -- that's a related but

11   different event than the actual point source discharge that

12   occurred on the northern end in connection with the leak

13   originally?

14      MR. WRIGHT:  It's -- well, it's our position that's the

15   ongoing nature of the continuous or repetitive nature of this,

16   but --

17      THE COURT:  Well, I'm not sure we're communicating

18   here.

19      MR. WRIGHT:  Yes.  I'm not sure of your question, Your

20   Honor.

21      THE COURT:  The rupture of that pipe happened on, what

22   day was it, January 30th?

23      MR. WRIGHT:  The 30th.

24      THE COURT:  30th.  All right.  And the leak began on

25   January 9th.

```
 1                MR. WRIGHT:  That's correct, Your Honor.

 2                THE COURT:  And so, there was a northern end point

 3     source discharge into the river prior to the pipe rupture on

 4     January 30th?

 5                MR. WRIGHT:  Yes, Your Honor.  Now, that -- yes.

 6                THE COURT:  Okay.  But -- and your position is that

 7     that continued and was ongoing, including the pipe rupture on

 8     January 30th?

 9                MR. WRIGHT:  Yes, sir.

10                THE COURT:  All right.  I understand.

11        Mr. Carey?

12                MR. CAREY:  Your Honor, if it would be okay with the

13     Court, Mr. Bryant is prepared to address this enhancement.

14                THE COURT:  Well, I just realized, before you do, does

15     that conclude your argument, as well, on the plus or minus 2

16     departures that are mentioned in the commentary to each of the

17     enhancements?

18                MR. WRIGHT:  It concludes my response with that

19     particular specific offense characteristic.

20                THE COURT:  Well, it sounds to me like we're sort of

21     dealing with all of these things at once.  So, I -- rather than

22     hearing your arguments piecemeal, I would like to hear the rest

23     of what you have to say about the other enhancements with regard

24     to those particular departures.

25                MR. WRIGHT:  Yes, Your Honor.  The second enhancement
```

1     after the six levels under (B)(1)(a) would be (b)(3), which

2     reads, "If the offense resulted in disruption of public utilities

3     or evacuation of a community, or if cleanup required substantial

4     expenditure, increase by 4 levels."

5          Your Honor, here, there were significant -- there was a

6     significant disruption.  I don't think that -- there's no doubt

7     about that.  To the extent that anyone is pointing, and I'm not

8     -- I'm starting to get arguments mixed up between defendants, but

9     to the extent anyone is arguing that a water company bears some

10    negligence here and, therefore, the disruption of public

11    utilities should not be attributed to the defendant, Your Honor,

12    I would point to a couple of things.

13         First, the language resulted in is not further defined in

14    the statute.  There's a Supreme Court case called *Burrage* --

15    B-u-r-r-a-g-e -- *v. United States*, a 2014 Supreme Court case that

16    deals with specifically the phrase "resulted from" in the

17    Controlled Substances Act.  That case, in that case, the Supreme

18    Court said "results in -- results from", which is very similar,

19    just a different tense --

20              THE COURT:  Well, Mr. -- Mr. Wright, before you go into

21    this argument, Mr. Carey and the defendant have agreed in the

22    plea agreement to this enhancement.  So, I don't think you've got

23    an argument coming that the enhancement shouldn't apply.  Am I

24    correct?

25              MR. CAREY:  That's right, just that it should be

1    reduced because of the negligence of the charge.

2              THE COURT:  Right.  So, they're not arguing -- they're

3    not arguing -- they're not making a causation argument with

4    regard to this enhancement regarding West Virginia American

5    Water.  I didn't think they were and I -- you know, I'm happy to

6    hear your argument, Mr. Wright, but I think you're --

7              MR. WRIGHT:  Okay.  Well, I'll move on to the part of

8    why, Your Honor, why there should not be a departure and that's

9    because of the scale of the significant disruption here and it's

10   because of the scale of the cleanup expenses.  Close to $2

11   million, I think it will be over $2 million.  Mr. Johns mentioned

12   to us at the hearing, with respect to the Freedom case, that he

13   was going to be writing more checks out of that remediation fund

14   and, if it wasn't at $2 million, it was going to go over $2

15   million with his additional checks.  That, in and of itself, Your

16   Honor, is a very substantial expense and that's the cleanup right

17   at the site.  That's for remediation at the site of the Etowah

18   Facility.

19        That factor, coupled with the tremendous disruption to the

20   economy and people's lives and the anxiety that it's caused here

21   are factors that should weigh against any downward departure for

22   that particular specific offense characteristic.

23        The next one that applies would be under Section (b)(4), "If

24   the offense involved a discharge without a permit or in violation

25   of a permit, increase by 4."  Comment Note 7, Subsection (b)(4)

1   notes that it applies or involves a violation or where there was

2   a failure to obtain a permit where one was required," but it

3   added this:  "Depending upon the nature and quantity of the

4   substance involved and the risk associated with this offense --

5   with the offense, a departure of up to two levels in either

6   direction may be warranted."

7        Here, Your Honor, we're talking about, in terms of the risk

8   involved, a chemical that was sitting on a riverbank in large

9   quantities, yards from the river, where the events, the

10  negligence, the failure to take action, the failure to implement

11  -- to develop and implement the stormwater plan -- was

12  long-standing conduct, long-standing failure to do what they were

13  supposed to do.  As time went on, it just makes things worse

14  because the condition of the plant from 2002-2012 is not going to

15  get any better.

16       Given the type of product that we have, we're not talking

17  about paper products, food wrappers, beer bottles, or garbage, or

18  other things, standard dirt that would qualify as a pollutant.

19  We're talking about chemicals, chemicals that overwhelmed, that

20  we've found out, the filters at the water company.  That just

21  heightens the risk involved.

22       So, those two factors, the type of product that went into

23  the river, and the long-standing nature of the offense, are

24  factors that count against the risk involved.  It counters any

25  kind of argument for a downward departure.

1       The quantity involved, there were several thousand gallons

2   of this that leaked out.  I don't think anyone has any real

3   accurate idea of how many gallons went into the water but, at the

4   hearing on January 27th, there was general agreement that there

5   was at least 7,500 gallons that actually leaked out of the tank.

6   There was certainly enough MCHM that went into the river to cause

7   this significant public disruption.

8       THE COURT:  All right.  Thank you, Mr. Wright.

9   Mr. Bryant or Mr. Carey?

10      MR. CAREY:  Well, we're going to divide it up, if

11  that's okay with the Court.  I'll let Mr. Bryant address the

12  enhancement for the continuous discharge.  I'll address the

13  arguments of Mr. Wright concerning the other two specific offense

14  characteristics.

15      We have argued in our brief, and the Court has noted in

16  prior sentencings, that the guidelines specifically contemplate

17  -- or specifically state that these guideline ranges and the

18  enhancements are based on knowing conduct and those that involved

19  negligence, a downward departure might be appropriate.  We think

20  that's truly appropriate here, where there's no allegation that

21  anyone acted knowingly or intentionally in causing this

22  contamination.

23      It is a case based solely on negligence and strict liability

24  under the Clean Water Act and the Refuse Act and, as a

25  consequence, there is no indication that -- or there's no

1    evidence even that they acted knowingly or intentionally.  So,

2    clearly, the invited departure should apply.

3         Now, Mr. Wright argues that, under Section (b)(3), that

4    certain factors obviate against a downward departure, but the

5    actual language of the note states, "This involves an enhancement

6    where a public disruption and evacuation of a cleanup at

7    substantial expense has been required," and that's why the

8    enhancement does apply, but the note says, "Depending on the

9    nature of the contamination involved, a departure of up to two

10   levels."

11        But that seems to clearly indicate, Your Honor, and we can

12   find no cases addressing this note, but it seems to indicate,

13   based on the nature of the substance, here it's MCHM and, as the

14   Court has noted, it caused a Do Not Use order for several days.

15   It was a minor irritant to skin and eyes, and perhaps other

16   related reactions, but there's no evidence of any long-term

17   effect.

18        And so, I do not believe that the enhancement, because of

19   the nature of the contamination, should apply.  The nature is a

20   mild one compared to something else that would have been toxic in

21   nature or otherwise dangerous.

22         The same argument applies then to specific offense

23   characteristic (b)(4), "If the offense involved a discharge

24   without a permit", and then it goes on to say, "depending on the

25   nature and quantity of the substance involved and the risk

1    associated."  Again, that seems to be speaking towards the

2    substance itself, how much, and was it a bad substance, and how

3    much of it.

4         Yes, there were 7,500 gallons; but, yes -- and, yes, it did

5    result in a disruption, but it's not one where it involved like

6    the Animas River in Colorado, where lead, and arsenic, and other

7    toxic substances clearly were discharged into the river.  That

8    may be one of those situations where a departure -- or it

9    obviates against a departure under a negligence prosecution, but

10   this isn't one of those, and I would suggest that Mr. Wright's

11   arguments do not carry today in opposition to the downward

12   departure of a minimum of two, and we think even more might be

13   appropriate, depending on the Court's findings for negligent

14   conduct.

15        And, if there's nothing further, Mr. Bryant will address the

16   continuous discharge argument.

17            MR. BRYANT:  Your Honor, with respect to the continuous

18   discharge argument, we have -- we agreed to that in the

19   calculations that are part of the plea agreement and we'll abide

20   by our agreement.

21        However, the Court has raised the inquiry whether this is a

22   -- an appropriate six-level or four-level enhancement under those

23   guidelines and I believe the Court first raised that at the first

24   sentencing in this matter, I believe it was Mr. Herzing, and so,

25   we will be glad to respond to that.

1          Upon further and deeper inquiry and legal research, it --

2     it's our opinion, legal opinion, that the six level does not

3     apply and the reason for that is, there are absolutely no cases

4     that we could find opine the continuous and repetitive guideline

5     based on the facts of a case that are like this one which, as the

6     Court noted at the earlier sentencing, one event, one event that

7     resulted in some of the chemical going into the river beyond one

8     day.  We can find no case that has applied a six-level increase

9     for that.

10         Each of the cases that we've read that apply the six-level

11    increase, the facts show that the conduct of the defendant caused

12    specific different acts causing discharge.  So, in the Fourth

13    Circuit case *Strandquist*, you have two discharges.  The Fourth

14    Circuit approved the six-level enhancement, but in that case, you

15    had the defendant intentionally discharging -- I believe it was

16    sewage, but whatever the substance was -- into the drain system

17    going into the harbor or the water on one day, and then you had

18    them doing it again some days later.  So, those are two different

19    events.

20         Every single case we reviewed was like that.  They were all

21    like that.  There was different conduct by the defendant.  It

22    wasn't that there was one event and some following pollution

23    getting into the water.  And the Government in its brief cites a

24    number of those cases.

25         Now, the counter to the argument is, one, the language of

1    the guideline itself, but you would think that somewhere along

2    the line in 2016, because these environmental cases have been

3    prosecuted for a long time now, at least 20-some years on a

4    fairly routine basis, that there would be some case law opined to

5    the six-level increase to a case like this where there's

6    basically one spill, one leak, and then the material continued

7    oozing off the bank or into the ground somehow.  That's not the

8    case.

9              THE COURT:  Mr. Wright?

10             MR. WRIGHT:  May I be heard in rebuttal, Your Honor?

11             THE COURT:  You may.  I also have a question for you.

12             MR. WRIGHT:  Okay.

13             THE COURT:  I realized, as I was getting ready for this

14   hearing, that I was around for this event and I know generally

15   how long it lasted, but how long was it from the point of the

16   leak, January the 9th, to when everyone's water service had been

17   restored?

18             MR. WRIGHT:  Your Honor, I think that was in one of our

19   briefings with respect to the recusal issue.

20             THE COURT:  I haven't read that for awhile.

21             MR. WRIGHT:  I believe the last date -- neither have I,

22   Your Honor, and that's why I'm going off memory.  I'm pretty sure

23   that it was January 17th, but it was a phased-in thing, depending

24   on what neighborhood you lived in.

25             THE COURT:  I remember that.  I was thinking it was

1    somewhere in the neighborhood of ten days to two weeks, but I

2    couldn't remember exactly.  It's not that important, but I must

3    -- I realized I can't put my finger on exactly how long it was.

4           MR. WRIGHT:  Your Honor, my memory was it was, at most,

5    eight days.

6        THE COURT:  All right.  Okay, you wanted to say something

7    in rebuttal.

8           MR. WRIGHT:  Yes, Your Honor.  I guess Mr. Bryant

9    raises a point about what we might say in rebuttal to his

10   argument, and my first point of rebuttal is, they agreed to it,

11   and now he's making an argument that basically seems to say we

12   don't agree to it.  It's a little bit different from saying

13   because of negligence, you should downwardly depart, but to say

14   it shouldn't apply in the first instance is a breach of the plea

15   agreement.

16      Secondly, Your Honor, the commentary on the negligence in

17   cases involving negligent conduct, a downward departure may be

18   warranted.  It doesn't say that it should be warranted or is

19   always applicable.

20      The note, Note 6, "depending upon the nature of the

21   contamination", I agree with Mr. Carey, I don't think there are

22   any cased that actually interpret what that means, but it

23   shouldn't mean somebody has to die or somebody has to physically

24   get ill that can be directly linked to contamination.  The

25   contamination is into the environment.  When it hits the water,

1    the environment has been contaminated in violation of the law.

2    When it's released outside of the containment area, the

3    environment has been contaminated.

4        There are any number of things that would fall short of a

5    chemical actually going into the water plant that would indicate,

6    well, maybe it wasn't as bad or as bad as it could have been.  If

7    the boom had been deployed immediately across the river, and I

8    don't know that that would have ever been possible or how long it

9    would have taken, then we wouldn't be talking about the

10   significant public disruption, but the fact is, it did go down

11   the river, it did enter the filters and go past the filters, and

12   disrupt the lives and the economy to a scale unprecedented.  That

13   kind of extraordinary event, Your Honor, is a suggestion of the

14   contamination involved.  To quote the language of the guideline

15   note means don't downwardly depart because of negligence.

16            MR. CAREY:  Your Honor, may I reply briefly?  I

17   apologize.

18            THE COURT:  You may.

19            MR. CAREY:  It's not a breach of the agreement, Your

20   Honor.  It was an agreement to calculation non-binding on this

21   Court.  After we executed the agreement, we understood it was

22   left open as to Burdette and Reynolds and was disputed in

23   Southern.  We understood from the Court's prior statements in the

24   other sentencings that this was going to be an issue determined

25   at the sentencing and, therefore, as officers of the court, we

1    brought to the Court's attention the benefit of our research.

2        And to say that this event is unprecedented, just in the

3    last few years, you've got Flint, Michigan; you've got the Animas

4    River; you've got the BP oil spill, exponentially greater damage

5    and disruption.  So, I just dispute the characterization of the

6    event, Your Honor.

7            THE COURT:  All right.  First of all, I would note that

8    I take responsibility for raising the issue, because I did, and

9    that puts the defendant in an awkward position and I'm not going

10   to hold that against him.

11       With regard to the issue of ongoing and continuous, frankly,

12   this is a difficult issue.  I think it's a close call and it's --

13   part of the problem is that this is a guideline that isn't used

14   very often and there's not been a lot of development of case law

15   on it, especially in the context of negligent activity.

16       To me, what is from a legal standpoint the deciding factor

17   in this is the comment, although it's getting to Comment 3,

18   although it's getting to a different point, and that's that

19   departure, it says that "the specific offense characteristics in

20   this section assume knowing conduct."

21       Well, when you view specific offense characteristics,

22   (b)(1), through that lens, it makes a lot more sense.  If you've

23   got knowing conduct going on, somebody who is intentionally

24   discharging pollutants into the environment, then it's easy to

25   understand what it means to be ongoing.  It's easy to understand

1     what it means to be continuous or repetitive.

2          It's much harder to understand that, in a negligent context,

3     where you've had what is essentially an accidental discharge that

4     is the result of negligence.  It's harder then to understand how

5     the terms "ongoing and continuous" apply, and they're clearly

6     there.

7          I'm not suggesting -- certainly not suggesting that those

8     words aren't in play here -- but this is a situation where

9     basically one leak occurred.  The defendants became aware of it

10    fairly quickly and acted, certainly arguably ineptly, but

11    immediately, to try to do something about it, and that took

12    awhile.  It took it awhile to stop the leak, took it awhile to

13    get it to stop going into the river, and it certainly took it

14    awhile to clean it up, but it's hard for me to say that that's in

15    the context of negligence, or less; and, by that, I mean strict

16    liability.  It's hard for me to say that that's something that's

17    ongoing or continuous.

18         One thought I have on that is, okay, where do you draw the

19    line?  At what point is it not ongoing and continuous?  When

20    you've got fluid leaking out of the container and running down a

21    bank, you know, even for five minutes, that could be seen as

22    continuous and ongoing, and I don't think that that's necessarily

23    what this guideline is getting at.

24         Or, conversely, you could say that it would only not be

25    ongoing and continuous if you, say, dropped an open container of

1    something into a river on a one-time basis.  I think those are

2    too -- too constricted.  Those examples are too constricted, but

3    it's difficult to know where to draw the line here in terms of

4    negligent conduct.

5         The cases that I have seen almost uniformly relate to

6    knowing conduct, which means they're really not very helpful and,

7    in the end, and I don't know if this is directly applicable on

8    this or not, but I go back to the Rule of Lenity.  On a close

9    call where it's not clear, you give the defendant the benefit of

10   the doubt.  And so, that's my ruling on this.

11        I'm going to overrule the Government's -- at this point, I

12   think, procedurally where we are is the Government's objection,

13   because the Presentence Report has a plus 4, and so I will

14   overrule that objection and sustain the position of the probation

15   officer on that.

16        Now, with regard to the plus or minus 2 departures that are

17   suggested in the application notes, my understanding was that the

18   Government was arguing for a plus 2 on each of those offense

19   characteristics and that these upward departures should negate in

20   any downward departure, as opposed to knowing conduct under Note

21   3.  On the other hand, the defendant, at least in the briefing,

22   contended that Note 3 should be effectuated by applying the minus

23   2 downward departures under Notes 4, 6 and 7.

24        I have a different view of this.  I think Note 3 is separate

25   from Notes 4, 6 and 7.  Notes 4, 6 and 7, frankly, provide little

1    guidance on when a departure should apply.  It is, of course,

2    discretionary and, because there's not a whole lot of guidance,

3    it's difficult to assess whether or not they should apply either

4    upward or downward.

5         Further, the parties stipulated to a calculation involving

6    none of these departures to individual offense characteristics

7    and there's no mention in that agreement of these potential plus

8    or minus 2 departures.  Nobody reserved the right to argue those.

9    Now, I'm not saying you couldn't, but it seems to me that what

10   the parties agreed to is significant, notwithstanding that the

11   defendant agreed to the plus 6 on (b)(1).

12        Thus, although the Court is not bound by the agreement on

13   the guidelines, the Court finds that it is instructed that the

14   parties did not reach an agreement for departures under, or take

15   into account departures, any arguments for departures, on Notes

16   4, 6 or 7.  Since both sides are arguing the opposite sides of

17   those departures and, in light of that agreement, I'm not going

18   to depart upward or downward under Notes 4, 6 or 7.

19        Now, I do note that the departure for negligence under Note

20   3, while discretionary, is clearly applicable in this case based

21   on the charges and, as I have noted previously, it is

22   unfortunately entirely undefined and standardless.  So, those are

23   my rulings on those issues.

24        Now, I believe -- I don't think my rulings are changing the

25   Presentence Report at all, are they?

```
1           Mr. Lambert, have you been --

2                 PROBATION OFFICER LAMBERT:  I don't believe that they

3     have.

4                 THE COURT:  All right.  So, I will adopt the

5     Presentence Report, most recent edition of the Presentence Report

6     and addendum, and I will order that it include Mr. Carey's

7     letter, as written.

8           I would note that I've received sentencing memoranda from

9     both sides.

10          I also received a number of letters from Mr. Carey, which I

11    have read.

12          Mr. Carey, do you have a redacted version of those for

13    placement on the record?

14                MR. CAREY:  Yes, Your Honor, and I believe they were

15    submitted in addition to the un-redacted ones.  If they weren't,

16    I will make sure they are.

17                THE COURT:  I don't know who has the redacted ones.

18    Does anybody?  I've got the -- I've got the original un-redacted

19    ones here.

20                MR. CAREY:  We'll make sure you have one for filing,

21    Your Honor.  I thought that was already taken care.

22                THE COURT:  Okay.  I'm informed that we have the

23    redacted copy in chambers.  Do you want those placed on the

24    record?

25                MR. CAREY:  Yes.  You can place the un-redacted -- I
```

```
1     mean the redacted versions on the record.

2              THE COURT:  All right.  Very well.

3         Is there any objection to that?

4              MR. WRIGHT:  No, Your Honor.

5              THE COURT:  All right.  That will be so ordered.

6         I also received some other materials in the last couple of

7     days.  One is a letter from a Lori Magana.  Another one is an

8     essay that was purported to me, although there's nothing on here

9     to indicate even who wrote it, but apparently, maybe it's a

10    college entrance essay that relates to the water crisis, and

11    then, finally, an e-mail from -- I guess it's from Maya Nye

12    attaching a -- an e-mail from someone else regarding their

13    experience with the water crisis.

14        You know, any thoughts -- first of all, has anybody seen any

15    of this stuff?

16        Oh, by the way, there's one other thing, too, while I'm

17    thinking about it.  Literally five minutes before the hearing was

18    scheduled to start, I received a letter from someone named

19    Pignato.  I don't know who this is.  I received it five minutes

20    before the hearing and, therefore, I haven't read it and I have

21    no intention of doing so.  I will place it into the record, if

22    anybody wants me to.  I wanted to let you know I got it.

23        It's not short.  It's -- it includes a two-page letter and

24    then a bunch of materials and I haven't had a chance to review

25    it.  To the extent that it's appropriate for me to be receiving
```

1   materials like this at all from somebody I can't even identify,

2   I'm certainly not going to read them if I receive them five

3   minutes before a hearing.

4       So, I'd like to hear what the parties have to say about

5   those materials.  And I have read the other materials.

6           MR. WRIGHT:  Your Honor, the college essay was

7   submitted through Ms. Nye to our office from a person who was

8   here and was affected by the water crisis and was a victim and

9   moved out of state.  I don't have her name right here.  Ms. Nye

10  is in the courtroom and she does want to speak.

11          THE COURT:  Well, we'll get to that.

12          MR. WRIGHT:  And perhaps she can bring up the name.  I

13  can't find the cover e-mails.  I don't have her name handy.

14      Mr. Pignato handed the letter to us just right before the

15  court hearing, Your Honor.  He is a resident of this area and was

16  a victim of the so-called water crisis.  So, I take this as a

17  victim impact submission as similar to all the others.  So, I

18  would ask that that be made part of the record, as well, Your

19  Honor.

20          MR. CAREY:  Your Honor, the essay and the other

21  materials that have been previously provided, we don't have any

22  objection to having them part of the record as a Victim Impact

23  Statement.  I would object to the one that was turned over five

24  minutes before.  I haven't had a chance to even read it in its

25  entirety.  I don't think that it's appropriate for the Court to

1    include it in the record given the timing of it.  It's possible

2    that it would raise issues that would require me to ask for a

3    recess and, you know, address if the Court would give any

4    consideration at all to considering it.  So, I -- the Court has

5    indicated it's not going to read it, not going to consider it

6    and, in light of that, I ask that it not even be made a part of

7    the record.

8           THE COURT:  Mr. Wright, do you have any objection to

9    that?

10          MR. WRIGHT:  Well, Your Honor, I would -- there is one

11   more sentencing and I would ask that the Court consider, and I

12   will forward this, a copy of this to the defense counsel for the

13   next defendant.  So, I would ask that it be made a part of the

14   record at least for that case, and that is this case.

15          THE COURT:  Well, I'll ask you to go ahead and forward

16   it to Mr. Southern's counsel.  At least one of them is in the

17   room right now, so they are now on notice of it, but I don't

18   think -- and, first of all, I'd say that under -- I don't know

19   exactly what deadlines were provided on the website or whatever,

20   but this has got to be untimely for this hearing, so I -- and

21   I've had no opportunity to read it, nor do I think I should.  I'm

22   not going to include it in the record in this case and I'm not

23   going to read it for this sentencing.

24       The other matters, I take it, there's no objection?  Is that

25   including the letter from Lori Magana?

 1          MR. CAREY:  I'm not sure we've seen that one, Your

 2   Honor.

 3          THE COURT:  I've had a trickle of stuff coming into my

 4   chambers over the last few days.

 5          MR. CAREY:  I know I haven't reviewed anything today

 6   and Phil said it came in today.  So, the Nye stuff was provided

 7   -- to the extent that we haven't seen it, Your Honor, I would

 8   object to its inclusion, as well.

 9          THE COURT:  Well, it's similar to -- I would say the

10   one I'm not putting into the record and I haven't read may not be

11   similar to the other things I've seen.  This one is pretty

12   similar to some of the other Victim Impact Statements.  I've read

13   it.  I am going to put it into the record because I have.

14          MR. CAREY:  That's fine.

15          THE COURT:  So, I will order that all of these things

16   be placed into the record.

17                    **GOVERNMENT EXHIBIT 1 ADMITTED**

18          THE COURT:  I would note for the record that the rest

19   of the victim materials that were submitted and are referenced in

20   the Presentence Report were placed in the record in the Reynolds

21   sentencing, during the Reynolds sentencing hearing, and is on the

22   public docket in his case and, unless there's an objection, I

23   intend to simply -- I'm obviously aware of those materials and I

24   simply mention those by reference.  I don't see any reason to

25   place them into the record in this case unless there's an

1    objection.

2              MR. WRIGHT:  No objection.

3              MR. CAREY:  No objection, Your Honor.

4              THE COURT:  All right.  On August 18th, 2015, the

5    defendant appeared before this Court and entered a plea of guilty

6    to Counts Two and Three of a 15-count second superseding

7    indictment.  Count Two charges him with unlawful discharge of

8    refuse matter in violation of 33 U. S. C. Sections 407 and 411.

9    Count 3 charges him with negligent violation of a Clean Water Act

10   permit condition in violation of 33 U. S. C. Section

11   1319(c)(1)(A), 1311, and 1318.

12       I deferred a factual basis finding at the time of the plea

13   hearing.  I now will find a factual basis.  I will adopt the

14   findings I made in other hearings as my findings.

15       The one note I would make is that, having reviewed Count

16   Three, I'm not a hundred percent convinced that the portion of it

17   under Section 1318 is -- I'm not real convinced by that, that

18   that -- the stormwater and groundwater plans would implement a

19   record keeping statute.

20       Now, I do think it's sufficient for 1311, so I'll make the

21   factual basis finding.  If it was based solely on 1318, I'm not

22   so sure I would find a legal basis for it, but since 1311 -- I

23   think it is satisfactory for 1311.

24       So, is there any objection for me finding a factual basis

25   based on those comments?

1              MR. WRIGHT:  No, Your Honor.

2              MR. CAREY:  No, Your Honor.

3              THE COURT:  All right.  I will, therefore, adjudge the

4    defendant guilty of both of those crimes and accept the plea

5    agreement that was previously filed.

6         I'm now ready to give my tentative findings as to the

7    applicable guidelines.

8         First, Mr. Wright, is there a motion for the third level for

9    acceptance of responsibility?

10             MR. WRIGHT:  There is, Your Honor.

11             THE COURT:  That motion will be granted.

12        Therefore, I find a Base Offense Level of VI; plus 4 for the

13   discharge of a pollutant; plus 4 for the disruption of a public

14   utility; plus 4 for a discharge in violation of permit, for an

15   Adjusted Offense Level of 18; minus 3 for acceptance of

16   responsibility, for a Total Offense Level of 15.  That is before

17   a departure under Note 3, but with a Total Offense Level of 15

18   and a Criminal History Category of I based on 0 points, I find an

19   imprisonment range of 18 to 24 months; 1 year of supervised

20   release; a fine range of $2,500.00 to $200,000.00; and a

21   mandatory special assessment of $50.00, which I note has been

22   paid.

23        I would also note -- now, that's it for the guideline

24   findings.

25        Are there any legal objections to my tentative findings as

```
 1    to the applicable guidelines?

 2                 MR. WRIGHT:  No, Your Honor.

 3                 MR. CAREY:  No, Your Honor.

 4                 THE COURT:  All right.  Let's talk about restitution.

 5    And before we get into those, the number has changed slightly

 6    that the State is claiming; is that correct, Mr. Wright?

 7                 MR. WRIGHT:  Yes, Your Honor.

 8                 THE COURT:  And let me see if I've got the number

 9    correct.  $29,320.72?

10                 MR. WRIGHT:  Yes, Your Honor.

11                 THE COURT:  And that's based on the expenses incurred

12    by the DEP that was originally claimed to include regular

13    salaries and the Government took the position that regular

14    salaries, as opposed to overtime should not be claimed, and

15    reduced it down to that number.

16                 MR. WRIGHT:  That's right, and there were some slight

17    adjustments to the "Other" category, quote, "Other" on the

18    invoice and I think the mileage changed slightly.

19                 THE COURT:  All right.  Well, this raises a question

20    that I've been wanting to ask in these hearings and didn't really

21    have occasion to ask, but I think is probably on the minds of a

22    lot of people who are watching this, and that is, for all the

23    years leading up to this leak, where was the DEP?

24                 MR. WRIGHT:  Well, Your Honor, they do not go out and

25    -- for resources, but I also think, because of mandate, they
```

1    don't go out and look at the SWPPP, or the stormwater plan, for

2    every facility.  There are just too many for them to do that.

3                THE COURT:  Do they look at some?

4                MR. WRIGHT:  They are supposed to.  At least the law

5    was, at the time of the stormwater plans or the permit was

6    switched from Pennzoil, the previous owner, to the Etowah

7    Facility, they were supposed to submit it to the DEP.  I'm not

8    sure.  I think the law has changed.  I think they have to have it

9    available, but I don't know that they -- they don't go out and

10   physically look at all those plans at the sites.  I think the

11   plan has to be submitted and then, when they're renewed, they

12   have to certify that they have one.

13               THE COURT:  Do they ever go out and look at sites?

14               MR. WRIGHT:  They do, Your Honor, but there are just so

15   many sites and the resources, I think, for the particular

16   division they'd have to inspect, they can't hit every single one

17   on any kind of a regular basis.

18               THE COURT:  I understand.

19        Does the defendant have anything to add on that question?

20               MR. CAREY:  I would just note, in relation to Mr.

21   Wright's comment, that in 2001, when the permit was transferred

22   from Pennzoil to ERT, they did have to submit to the DEP an SWPPP

23   and a Groundwater Protection Plan as part of the application and

24   it had been, as I understand it, reviewed and approved by the

25   DEP.  That obviously did not take place.  That's when --

1          THE COURT:  Well, is that maybe because there was

2     already one in place with Pennzoil before or --

3          MR. CAREY:  We don't know that.

4          THE COURT:  Or maybe we're assuming there was one in

5     place before.

6          MR. CAREY:  I think we're just assuming because, as I

7     understood Mr. Wright, I don't know the expanse of his grand jury

8     subpoena, but they obtained the files from the DEP of --

9     concerning Etowah River Terminal and there was no plan except for

10    what they -- has been identified as the "Draft Plan" and that may

11    have been acquired on the day of the leak from the offices of

12    Freedom.  We're not blaming the DEP, but that is one of the

13    safeguards.

14         And, in 2009, when an employee of or the consultant for

15    Freedom submitted the application for the renewal of the permit,

16    he made the affirmative representation there was one in place and

17    on-site.  He just assumed there was and did not check.  That's

18    part of the underlying negligence in this case, but it's a -- you

19    know, that safeguard, to the extent that it's required to be

20    filed and approved by the DEP, it did not occur.

21         THE COURT:  Do we agree that the -- if I were to impose

22    restitution in this case, the sole authority for that is my

23    discretion to impose it as a condition of some sort of

24    supervision?

25         MR. WRIGHT:  We agree, Your Honor.  I agree.  I don't

1    think there's any statutory basis to enter an order of

2    restitution independently of the conditions of probation or

3    supervised release.

4              THE COURT:  Is that your understanding, as well, Mr.

5    Carey?

6              MR. CAREY:  It is, Your Honor, but when you refer to

7    restitution, are you referring to the DEP's --

8              THE COURT:  That's the only thing that's at issue.

9              MR. CAREY:  All right.  Yes, I agree with your

10   statement and Mr. Wright's.

11             THE COURT:  Well, here's where I'm coming from on this.

12   I -- as I have spent a lot of time with these cases over the last

13   few weeks, the question I keep coming back to is, why didn't the

14   -- why wasn't the DEP out there looking at this place?  And I

15   realize that there's probably a resource issue and you can't --

16   probably can't -- the DEP can't probably go out and inspect every

17   single facility that has one of these form permits, but this

18   facility went for over a decade and, you know, we're all very

19   familiar with what happened, what didn't happen, and the results,

20   but we're talking about a facility that was storing chemicals a

21   mile and a half up the Elk River from an input for a community

22   water system that served an awful lot of people and it's also at

23   a location that's very close to the State Capitol.  I don't know

24   where the DEP's headquarters is, but I'm get guessing it's

25   somewhere in Charleston; is that right?

1              MR. WRIGHT:  It's in Kanawha City, Your Honor.

2              THE COURT:  All right.  So, less than ten miles away

3      from the DEP's headquarters, and they -- I have no evidence that

4      they ever went out and looked at this place.  They took Mr.

5      Reynold's word for it on the application that they had these

6      plans in place which, you know, I guess when you're dealing with

7      a large volume of renewal applications, you can understand that,

8      but it just seems to me that somebody with DEP should have gone

9      out there at some point and looked at this place and, from what

10     I've learned about this case, if somebody really knew what they

11     were doing in terms of the environment and the requirements for a

12     facility like this, if they walked out there and walked onto this

13     facility, the problems would have been obvious, and they didn't

14     do that.

15        And I'm not necessarily casting blame on any person in

16     particular.  I understand there are probably only so many DEP

17     inspectors, only so much that can be done.  Maybe there was a

18     policy issue.  Maybe this has been dealt with to some extent

19     legislatively since this incident.  I haven't studied that

20     closely.

21        But the bottom line for me is that, for this particular

22     facility and in terms of the proximity to other resources and

23     infrastructures, it is troubling enough to me that the DEP was

24     never there, that I am not going to include restitution in this

25     case.  So, I think that's the price the State pays for not having

1    done that.

2        So, I am not going to impose any restitution as a condition

3    of any sort of supervision in this case and you can note any

4    objection that you might like to for that at this time.

5            MR. WRIGHT:  Your Honor, I would ask that the Court

6    note my objection.

7            THE COURT:  It is so noted.

8        All right.  Mr. Wright, we've reached the point where I'm

9    going to ask you if all victims have been accorded their various

10   rights and notifications under the various Victims Rights

11   statutes and notifications?

12           MR. WRIGHT:  Yes, they have, Your Honor.

13           THE COURT:  And I think you indicated previously that

14   Ms. Nye wishes to address the Court.  Does anybody else?

15           MR. WRIGHT:  Not that I'm aware of.

16           THE COURT:  All right.  Somebody is raising their hand

17   in the back.  I have no idea who it is.

18           MR. RODNEY WILSON:  You had mentioned if anybody would

19   like to address the Court on the things that are going on as far

20   as sentencing.  I'm a --

21           THE COURT:  Hang on a second.  I'm not saying you're

22   getting to address the Court.

23           MR. RODNEY WILSON:  Oh, I'm sorry.

24           THE COURT:  I want to know who you are.

25           MR. RODNEY WILSON:  My name is Rodney Wilson.  I'm a

1    friend of Denny Farrell's.

2              THE COURT:  Well, I think you need to make sure you've

3    talked to his counsel first before that.  I want to talk to Mr.

4    Wright.

5        You don't have anybody else that intends to address the

6    Court?

7              MR. WRIGHT:  I've only been aware -- I'm only aware of

8    Ms. Nye wanting to address the Court, Your Honor.

9              THE COURT:  All right.  And, Mr. Wright, can you give

10   me a little bit of a preview of what Ms. Nye's presentation might

11   be because I -- I want to make sure that what I -- I don't have

12   any idea what I'm going to hear or what the presentation is going

13   to be like and I want to make sure that it's reasonable.

14             MR. WRIGHT:  I think it's going to be the impact that

15   this had on the community, perhaps her personally, but I think

16   more on the community, but I haven't asked her specifically to

17   tell me what she wanted to address.

18             THE COURT:  How long do you think this is going to

19   take?

20             MR. WRIGHT:  Ten minutes, Your Honor.

21             THE COURT:  Well, I'm going to ask her to try to keep

22   it to five, but I'm not going to put a clock on her either.  So,

23   I will ask her to come forward and she may address the Court from

24   the podium.

25        By the way, I'm not sure that I have to do this because,

1    given the position the Government has taken regarding victims in

2    the case, and restitution and whatnot, I'm not sure that I have

3    to do this, but because there's only one person that wishes to

4    address the Court, and it appears that it would be a reasonable

5    presentation, then I think it's an appropriate use of time.  So,

6    I will allow it to occur.

7         Ms. Nye, you may come forward.

8         Does anybody want to have her placed under oath?

9              MR. CAREY:  No, Your Honor.

10             MR. WRIGHT:  No, Your Honor.

11             THE COURT:  Ms. Nye?

12        (Statement given by Maya Nye.)

13             THE COURT:  Thank you, Ms. Nye.

14             MS. NYE:  Zuri Barnes was the name of the young woman

15   who submitted the essay.  She was a student of mine.

16             THE COURT:  All right.  Very well.

17             MS. NYE:  Can I give these to the Court?

18             THE COURT:  Well, here's the thing, Ms. Nye.  You

19   submitted the letter earlier, so you know how to send stuff in to

20   the Court.  We're having a sentencing today.  I don't have time

21   to read that, so I'm not going to accept it for this hearing, and

22   you're well aware another one is coming up.  If you want to

23   submit it for the next hearing, you may, but, you know, it's

24   untimely for this hearing, so I'm not going to accept it.

25             MS. NYE:  Okay.  I will, Your Honor.  Thank you.

1          THE COURT:  All right.  Under the circumstances, I

2     suppose I need to give counsel an opportunity to respond, if they

3     wish, both sides.

4          MR. WRIGHT:  Your Honor, I don't have anything to add

5     at this point on that.

6          THE COURT:  Fair enough.

7          MR. CAREY:  Your Honor, I think I can address my

8     response to the comments made by Ms. Nye in the comments that I

9     plan to make on behalf of Mr. Farrell and it may lengthen it a

10    little bit, but I'll address it then.  I think it's better to do

11    so then.

12         THE COURT:  All right.  I appreciate that.

13      I guess the only comment I would make, and I think that it

14    was appropriate, in fairness, to hear from Ms. Nye, but I want to

15    point out that my perspective is that Ms. Nye was not under oath.

16    Therefore, she was not testifying.  Her statement was not

17    evidence for the Court.

18      Moreover, much of what she said would be in the nature of,

19    if anything, legal argument, or analysis, or expert material that

20    has not been subjected to the adversary process, the Rules of

21    Evidence, or presented through counsel.  So, I'm happy to hear

22    her comments, but I think that they have to be placed in the

23    proper context for this proceeding, and that's all I have to say

24    about that.

25      All right.  Mr. Farrell, at this time, the Federal Rules of

1    Criminal Procedure give you the right to make any statement that

2    you would like to make, although you're not obligated to make any

3    statement.  However, if you do choose to make a statement, I

4    would ask that you stand to do so.

5         THE DEFENDANT:  Thank you, Your Honor.  First, let me

6    say, I truly accept -- I truly acceptance of responsibility for

7    the spill.  As owners and executives of Freedom Industries, Chip,

8    Bill, Gary, myself, we were -- we were responsible for operations

9    of the facilities and we were responsible to oversee the quality

10   and completeness of all the employees for the tasks that they

11   were assigned.  I accept the responsibility.  I'm truly sorry for

12   what happened and I'd like to apologize to the community as a

13   whole.

14        I never intended for this to happen.  I can assure you, I

15   have learned a lot since this event.  I worked very hard over the

16   years to get Freedom Industries started and I helped build

17   Freedom Industries to the point that it grew when it was sold.

18        Freedom provided over 30 good-paying jobs that have all been

19   lost because of this event.  I want to apologize to you, Your

20   Honor, to the public, and to all those employees who worked so

21   hard towards our success.

22        When I sold Freedom Industries, I had a plan that I would

23   work three years and get my earnout and then maybe retire.  All

24   of that has been lost, Your Honor.  All the work, all the dreams,

25   15-plus years, gone in an instant.  For that, I apologize.

1    My ability to find work going forward has been made much

2    more difficult because of this spill.  My hope was -- I just -- I

3    wish I could go back with the knowledge I have now, for the

4    knowledge I have now from this event.  I assure you I would have

5    acted different, much different.  I can assure the Court I will

6    never be put in this position again and I will never forget the

7    lessons that I have learned throughout this process.  Thank you.

8         THE COURT:  Thank you, sir.  You may be seated.

9    Mr. Carey, anything else on behalf of the defendant?

10        MR. CAREY:  Yes, Your Honor.  I guess they don't want

11   me to talk long because there's no more water.

12   Mr. Farrell stands convicted before this Court of two

13   misdemeanors, a violation of the Refuse Act and a violation of

14   the Clean Water Act, and the factual basis for that plea, which

15   the Court is well aware, recognizes that as an owner, officer,

16   and director of Freedom and its related companies, he was a

17   responsible corporate officer under the law and, in that

18   capacity, he failed to ensure that the stormwater plans were

19   developed and implemented, and that failure was a cause in the

20   contamination because the secondary containment system failed to

21   keep the MCHM from reaching the river.

22   The Court now must decide the appropriate sentence for Mr.

23   Farrell and, under Section 3553, the Court must impose a sentence

24   sufficient, but not greater than necessary, to comply with the

25   statutory purposes of sentencing in the federal system.  I

1     believe that there are two for appropriate -- appropriate for

2     discussion, at this point, Your Honor, and that is the need to

3     promote consistency in sentencing and, also, to provide

4     deterrence to others who are in similarly situated circumstances.

5          Of all the defendants in this case, I believe that Mr.

6     Farrell is virtually identical to the circumstances of Mr. Tis

7     and Herzing.  All three had a background in the sale and product

8     development in the chemical industry and came together in the

9     mid-90s to form Freedom Industries.

10         From the beginning, each of them shared equal ownership.

11    While, in terms of Freedom, there was some minority interest,

12    they had the bulk of the stock.  In 1999, they formed Poca

13    Blending to further their activities and, in 2001, they acquired

14    Etowah River Terminal and jointly owned that between the three of

15    them.  They were the only owners of ERT and they were all

16    officers and they were all directors.  Thus, all three had equal

17    authority and responsibility for the operation of ERT and that

18    does distinguish them from Mr. Farrell -- I'm sorry, Mr. Reynolds

19    and Mr. Burdette -- who had certain responsibilities, but did not

20    have attending authority.  Therefore, because they had equal

21    ownership, they had equal share in the success.  They also had

22    equal responsibility to operate ERT in compliance with the law.

23         But importantly, all three had to make the decisions

24    jointly.  They had to approve the hiring of each person that was

25    added and, in particular, Reynolds, Burdette and Southern.  All

1  three had to approve any expenditures over $5,000.00.

2  So, the question is, as between Mr. Tis, and Herzing, and

3  Mr. Farrell, should they be treated differently?  Well, what are

4  the differences in those sentencings?

5  First, Tis and Herzing pled guilty to one count; whereas,

6  Mr. Farrell has pled guilty to two, but the pleas are based on

7  their positions as responsible corporate officers.  It involves

8  the same conduct, failure to develop and implement the stormwater

9  plans.  They face the same guideline calculations and has the

10  effect to simply increase -- his two counts have the effect of

11  increasing his maximum exposure, the mens rea strict liability

12  for a Refuse Act violation but, as Mr. Tis's own lawyer said --

13  I'm sorry, Mr. Herzing's own lawyer -- they didn't exercise

14  sufficient due care.  That's the standard of negligence.

15  It's also been suggested that Mr. Tis and Herzing lived in

16  Pittsburgh and, therefore, perhaps didn't have the same

17  opportunities.  And, if we were talking about a single event

18  which developed and occurred within a very short period of time

19  to which they had no reason to know then, yes, if Mr. Farrell did

20  have reason to know and didn't do something about it then, yes,

21  maybe he should be treated differently.

22  But we're talking about the failure to implement a plan

23  dating back to its origins in 2001 and continued during the

24  entire time that all three of them owned it up until the sale.

25  It also involved the failure of the containment system to hold

1   back the leak and, as the Court has noted, we believe that a

2   majority of it not went through the cracks of the wall, but went

3   below the tank, underneath the wall and out, and we believe that

4   it followed a trench that had formed under a stormwater pipe.

5   That is a condition which had existed for quite sometime and with

6   which Mr. Tis and Herzing were personally aware.

7        They indicated that they came down once a quarter.  We

8   believe it's more often, but accepting their numbers, that's four

9   times a year, times 12 years, that's 48 trips to the site.  They

10  were also in regular contact by phone and e-mail and they

11  participated by phone at times in the weekly management meetings.

12  They received detailed minutes of these meetings from Mr.

13  Burdette and, if you've seen any of them, you know that they are

14  very detailed.

15       In May of 2009, Mr. Burdette sent minutes to Mr. Tis and

16  Herzing saying there was a need to update the stormwater plans.

17  They didn't say what plans.

18       As to the condition of the wall, Mr. Burdette forwarded them

19  a Visions Report that said, quote, "General damage that could" --

20  noted "General damage that could impact containment."

21       And, as to the wall itself, Mr. Farrell -- I'm sorry, Mr.

22  Burdette said he sent e-mails to Tis and Herzing, as well, about

23  these things.  So, Tis and Herzing had every opportunity to know,

24  just as Mr. Farrell did.

25       And, in terms of Mr. Farrell's day-to-day activities while

 1    he was on-site, as the Court has seen from the pictures, I

 2    believe, the office was separate and apart from the tank farm.

 3    It was nearby, but his job was dealing with suppliers and buyers,

 4    and so, he was on the phone placing orders, traveling to customer

 5    sites.  He did not regularly walk through the tank farm.

 6         There is one important point, and I want to make it not as

 7    an argument that he should be exonerated, but it puts it in

 8    context that he did attempt to do something that may have -- and

 9    I say "may have" because I don't think we can know, ever know --

10    but it may have had an impact on the amount of material that

11    reached the water and that involves the fixing of the stormwater

12    pipe.

13         Now, if I may indulge the Court, this is a photo that Mr.

14    Wright has previously provided to the Court.

15         May I approach, Your Honor?

16              THE COURT:  You may.

17              MR. CAREY:  Phil, do you want to come with me?  If I

18    may, Your Honor, I'm going to be talking about this stormwater

19    pipe here.  All right?

20         That shows up just to the right of this red brick building,

21    and below the wall, and here's 396.  All right?  This is a

22    picture that was taken after the leak was discovered, and I'm not

23    representing and, in fact, I will tell you, it doesn't accurately

24    reflect the day of the leak because there had been some

25    excavation done trying to get down to the water and the MCHM and

soak it up, but for many years, you could see the top of the --
of this pipe sticking out of the ground and it was the water that
was flowing underneath this pipe that ran during the driest of
summer days and caused this trench to go down the river and we
believe that's where the majority of the materials flowed.

And so, that was a condition that, according to the pipe
manager that preceded Mr. Burdette, Mr. Farrell told him when he
was hired, "That is one of the three main issues that I want you
to fix."

And I'll show you, Judge, in this picture, this square is
the intake culvert.  There's sort of a collection ditch dug here.
Here's the railroad, and then the road, Barlow Drive, Barlow
Road, right in this little depression area collected the water
and, when it rained, it took it from this culvert -- and this
dotted line is that pipe that sticks out -- and goes underneath
the property.

Mr. Farrell indicated to the prior plant manager that he
wanted the erosion of the banks fixed and Mr. Burdette indicated
that, at that time, they planned to put a camera below that pipe
in the hope of determining what was the cause of that ongoing
water flow.

Well, they obtained estimates upwards of $280,000.00 to fix
it and Mr. Tis and Mr. Herzing came to the site.  Mr. Herzing
walked the bank, went down and looked at this area of erosion,
and indicated -- or came back into the office and looked at an

1     aerial photo and said, "It hasn't changed in all of these years,

2     we're not going to spend the money."

3          Now, that doesn't exonerate Mr. Farrell.  He is responsible

4     for the condition of that facility on January the 9th, to the

5     extent that his prior actions before he sold it led to those

6     conditions.  It's just a way of putting his role into context.

7     Had that bank been fixed at that time and had they determined the

8     cause, maybe that point source would not have been created.

9          Now, that brings us to the only difference then that I see

10    between Mr. Tis, and Mr. Herzing, and Mr. Farrell, and that is

11    that they do have the benefit of a 5K motion, and that was for

12    their testimony in this case.  Now, I'm not saying that they

13    should not have received it.  What I'm saying is, the opportunity

14    for Mr. Farrell was different.  He was facing multiple civil

15    suits, which Tis and Herzing, for whatever reason, were not, and

16    so a plea of guilty to a negligent discharge under the Clean

17    Water Act resulting in contamination would have had res judicata

18    effect and exposed him to ruin as to judgments without any

19    defense.  And so, we did our best to limit his exposure under

20    those civil cases.

21         He was also tied up in the proceedings in the bankruptcy

22    case.  And, once we did settle one of the class action cases and

23    reach agreement on one of the other state cases, we did turn our

24    attention to resolving this case.  It's not the only reason, but

25    it is a reason.  And so, as the last one in, he doesn't have such

1     a motion.  So, the question is, in sentencing him, is probation

2     appropriate without a 5K motion?

3         This Court has graciously provided to us updated information

4     concerning the sentencings of individuals who are convicted under

5     the Clean Water Act and some of that data indicates that in 2014,

6     of those who pled strictly to misdemeanor violations, 90.7

7     percent of them received either a fine or probation.  Another .8

8     percent of them received some combination of probation and

9     confinement, and I assume community or home confinement, and only

10    6.5 percent went to prison.

11        Another example is the Deep Horizon case, a case that

12    everyone is aware of, unfortunately, resulting in the deaths of

13    11 people and untoward damage to the ecosystems of the Gulf.

14    Some of those people got prosecuted for felonies for destruction

15    of documents.  They received probation.  The person who pled

16    guilty to the Clean Water Act violation for polluting the Gulf

17    with oil entered into an agreed-to sentence with the U. S.

18    Attorney's Office for ten months of probation, a $50,000.00

19    contribution to a wildlife fund, and a hundred hours of community

20    service.

21        Those statistics, that case, reflects what we, as a society,

22    have chosen to punish those people committed -- who have

23    committed negligent acts resulting in some harm.  But even in

24    West Virginia, if you want to draw a comparison, the negligent

25    homicide statute which applies to a person who operates a car

and, through his reckless disregard for the safety of another

kills a person is charged with negligent homicide, but the

statute itself says it requires actually more than negligence.

It says, "The negligent homicide statute requires the driving of

a vehicle in reckless disregard for the safety of others, and

this means that more than negligence is required."  Even

negligent homicide is a misdemeanor punishable of up to a year in

jail, but it requires recklessness.

Generally, as a society, we don't imprison people for

negligent behavior.  There are other remedies that are sufficient

to deter.  And so, the question is, is a sentence of probation,

or some other sentence that doesn't require him to be imprisoned,

appropriate to deter others who are similarly situated?

Well, from a company standpoint, Chemstream spent $20 -- I

mean $12 million -- requiring the ERT and Freedom Companies and

Poca Blending, and it was gone within 30 days.  That is a

powerful deterrent to other companies that you'd better get your

act in line.

As to the individuals who may be in the position of Mr.

Farrell, this case has had a substantial impact on Mr. Farrell.

He has faced many civil lawsuits.  Two were just filed last

month.  And so, the settlements he reached, to the extent that he

was able to resolve those, going forward, he still has others to

face.

He agreed to release his claim to the AIG Insurance on the

1    company for defense costs and indemnity to allow that money to be

2    paid into the bankruptcy estate to help settle the claims and pay

3    for the cleanup.  He's agreed to release the remaining money and

4    the sales escrow account, which originally was around $3 million,

5    but was down to $1.9, the last figure I saw, so it could go to

6    pay claims and for cleanup.

7         He paid $50,000.00 to settle one of the civil suits, but

8    that was done only after the plaintiff's lawyers did an asset

9    review of Mr. Farrell to determine what the appropriate

10   settlement was.

11        He's had substantial legal fees that probably are greater

12   than any single client I've ever had, Your Honor, and that's

13   because he's faced criminal cases, civil cases, and bankruptcy.

14   And it's not just me.  We've had to bring in bankruptcy counsel

15   and other counsel as the needs arose.

16        Mr. Farrell has lost most of everything he gained after

17   working 15 years to build Freedom.  Going forward, he lost a

18   three-year employment contract, which he indicated after which,

19   he probably would plan to retire.

20        Just recently, within the last probably four weeks, he has

21   found a job which pays him about one third of what he would have

22   made on an annual basis under those contracts.  He lost the

23   earnout that he was to receive going forward under the sales

24   contract, which may have paid him an additional $1 million.  And

25   so, you can see it's had a huge economic impact on Mr. Farrell

1    and his family.

2        His daughter lost her job.  She was one of the 30 employees

3    that had good-paying jobs at Freedom.  He used to provide

4    significant financial support to his very elderly and ill

5    parents, as set forth in one of the letters, but that has been

6    significantly curtailed.  And the workers he considered family

7    all lost their jobs.  Some have not yet found new ones.  That

8    would only serve as a human impact going forward to others

9    similarly situated.

10       Your Honor, Mr. Farrell is a good man, as shown in these

11   letters.  He's a good father and he's a good husband.  I was

12   amazed at the quality of the letter that was sent about him by

13   his ex-wife.  It was such an amazing thing to see her say such

14   glowing things about his qualities as a person and his qualities

15   as a father.

16       His competitors say they can't get business from him because

17   he was so trustworthy, he always did what he told his customers

18   he would do, and so they never left him, and it reflects that he

19   has a charitable heart, often giving money to others.

20       Your Honor, I believe the sentence that allows him to remain

21   in the community either under Zone A or Zone B is an appropriate

22   result and so, therefore, I would ask for a departure under Note

23   3, and/or in combination with a variance, for the reasons I have

24   stated, and for consistency in sentencing, to result in such a

25   sentence.  Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Carey.

2      Mr. Wright?

3          MR. WRIGHT:  Your Honor, it's been said many times that

4    this was an environmental crime with very serious and significant

5    consequences, a tremendous disruption to people's lives, harm to

6    the economy, and a level of anxiety that ensued as a result of

7    the discharge of MCHM in the subsequent Do Not Use advisory that

8    makes this just simply an extraordinary case and, up until

9    January, 2014, and I didn't mean to suggest that this was

10   unprecedented in light of what happened in Flint, but Flint

11   happened after this case, and I'm not aware of any interference

12   with a community water supply on this scale before this case

13   happened, and it happened because of a long-standing negligence

14   that goes back to 2002.

15       Six individuals have been prosecuted in this case, so the

16   blame -- and the corporation.  The blame does not fall solely on

17   any one person's shoulders.  This was a case with individual, but

18   also institutional failure, to comply with the law.  There was a

19   cultural failure at this corporation.  And the leader of that

20   corporation for many years, the head of the corporation, the

21   president of the corporation, was the defendant.  He's a

22   businessman.  But in these kinds of cases -- and he doesn't have

23   any criminal history points, but that's not unusual for a case

24   like this.  He was associated with Freedom for many years and he

25   was responsible for and he set the culture.  He was the one who

1    set that culture.

2        By all accounts, he was a hard-working businessman, very

3    successful for many years, and his focus was to make money.

4    That's what businesses do, and we don't begrudge that.  We want

5    businesses to make money or there won't be any businesses, but

6    you have to do it responsibly.  You have to do it with a level of

7    care commensurate with the risk of your business, the risk that

8    your business creates, and the more risk involved with your

9    business, then the more due care that you should exercise in

10   proportion to that risk.

11       He didn't sell shoes.  He didn't run a book store.  He ran

12   an industrial plant filled with chemicals in a tank farm,

13   thousands of gallons of chemicals that are sitting on a riverbank

14   just yards from a river.  In light of that, you need to take

15   appropriate measures to make sure that those chemicals never,

16   ever contaminate the environment.

17       Mr. Carey has pointed to his efforts and his desire to have

18   an erosion project taken -- or undertaken in -- that project was

19   undertaken, or supposed to be undertaken in 2009, and he points

20   out that the co-defendant, Mr. Herzing, vetoed it because, under

21   their policy, one veto by the owner would result in the project

22   not going forward.  There's no evidence that Mr. Farrell tried to

23   convince Mr. Herzing, "Boy, this is really serious.  We need to

24   do this."  No evidence he tried to persuade him, encourage him,

25   try to change his mind, or otherwise convince him that he was

1    wrong.

2         In 2010, Your Honor, the tank -- and I would ask that you

3    make the drawing of this chart that Mr. Carey handed to the Court

4    an exhibit.

5              THE COURT:  I'll make them all exhibits, if there's no

6    objection.

7              MR. CAREY:  No, Your Honor.

8                   **DEFENSE EXHIBITS 1, 2 & 3 ADMITTED**

9              MR. WRIGHT:  If you look on that, Your Honor, the

10   Stormwater Plot Plan that's dated June 10th, 2009, it shows Tanks

11   393-397 all sitting on that concrete pad.  In 2010, they

12   discovered that Tank 393 was leaning, leaning towards the river.

13   They had their own leaning tower of chemicals sitting on their

14   tank form leaning towards the river.  They had to fix it.

15        It was nine inches off center in 2010.  They didn't fix it

16   until 2011, by which time it was well over ten inches off center,

17   and they fixed it by digging underneath the high side, digging

18   the dirt out from under it, and having it settle back down.  That

19   should have been an indication, we've got problems here at this

20   tank form.  They didn't do anything after that to -- he did not

21   then go back to Mr. Herzing and said, "Well, now we really need

22   to take look at the erosion project."

23        At the June 20th -- or January 27th hearing, it was

24   suggested that Mr. Farrell always believed that the concrete in

25   that pad extended underneath these tanks.  Well, in light of what

1    happened in 2011, when they dug dirt out from under that leaning

2    tank, that just isn't credible.  Beyond that, the pictures that

3    we have submitted to the Court, Your Honor, show an extensive

4    amount of cracks, serious looking cracks, in the area around

5    Tanks 395 and 396.

6        If you looked at those cracks, I don't see how you can

7    think, well, gee, everything should be fine because there's

8    concrete under the tank, or so I believe, when there's cracks all

9    over the concrete.  That just underscores the amount of the

10   negligence that happened here, Your Honor.

11       Your Honor, I don't take issue with any of the letters that

12   were written on his behalf.  Those are very fine letters.  But

13   that's not what this case is about.  It's not about whether he's

14   a nice guy.  It's not about whether Mr. Farrell is generous.

15   It's not about whether Mr. Farrell is kind to strangers.  He is

16   all of those things, according to those letters, and I don't have

17   reason to doubt those things, but the case is about did he do

18   what he should have done, and the answer is no; emphatically, no.

19   For many years, no.  The level of attention paid by Mr. Farrell

20   and his company and his fellow managers to important

21   environmental concerns was simply appalling.

22       Now, Mr. Farrell pled guilty in this case, as did all the

23   other individual defendants, but he only did so after all the

24   other defendants signed or agreed to sign plea agreements, and

25   now he's asking for basically the same treatment in comparison to

1    Mr. Herzing and Mr. Tis for the sentences they received when he

2    came in last.

3        Mr. Farrell is represented by a former United States

4    Attorney and a former Assistant United States Attorney, who all

5    know the score and the way the system works, that if you want

6    credit and if you want acceptance to get the Government to file

7    something on your behalf for substantial assistance, then you've

8    got to come in, and to sentence these guys at any level

9    commensurate with Mr. Herzing and Mr. Tis would be basically to

10   say those substantial assistance motions are worthless.

11       He should be treated differently because of his leadership

12   position, because he made the choice not to plead guilty when

13   they did, because of the chronic inattention paid by him to

14   important environmental matters, and the long-standing failure to

15   exercise due care, which means a long-standing failure to act as

16   a reasonable person in his position should have.

17       So, yes, he is a nice guy.  It doesn't matter that he won't

18   do it again.  We know that he will not be in a position to do

19   this again.  But, Your Honor, there are other equally and, in

20   fact, more important factors here under the sentencing statute,

21   3553.

22       This is not the usual case.  It's not even the most -- it's

23   not even a usual environmental case.  An appropriate sentence for

24   almost 12 years of negligence that resulted in the amount of

25   disruption that this case resulted in indicates that the

1    sentencing factors of general deterrence, a sentence that will

2    reflect the serious nature of the offense, and a sentence that

3    will promote respect for the law are paramount factors that

4    should be considered and a guideline sentence will serve those

5    interests and the interests of justice.

6            THE COURT:  Thank you, Mr. Wright.

7            MR. CAREY:  Your Honor, may I just briefly respond?

8            THE COURT:  You may.

9            MR. CAREY:  He said that there was no evidence that he

10   tried to persuade Mr. Herzing.  This is from their grand jury

11   testimony of Mr. Burdette.  He was asked if anyone tried to

12   persuade Herzing to go forward with the project.  Mr. Herzing --

13   Mr. Burdette said, "Even though it did not take place in his

14   presence", quote, "I'm sure Denny did because he was the owner

15   putting up the project."

16        Also, the big tanks had gravel around them.  They pumped in

17   concrete later to help stabilize it.  It was the small tanks that

18   were surrounded by concrete, Your Honor.

19           THE COURT:  All right.  I'm going to take -- we've been

20   going about two hours.  I'm going to take about a 15-minute break

21   and then I will be back to proceed to a disposition.

22        (Recess taken.)

23           THE COURT:  All right.  After consideration of the

24   advisory guidelines and the other applicable factors under 18 U.

25   S. C. Section 3553(a), I am now ready to impose sentence.

1          Will the defendant please stand?

2          Mr. Farrell, the "Water Crisis" was a traumatic event for

3     the communities in the area where the water service was impacted.

4     It was appalling to realize that a contamination of something so

5     basic, yet essential as drinking water, could happen in this day

6     and age with all of the environmental regulation and awareness

7     that now exists.

8          This event now, two years past, clearly had a disruptive

9     effect on people's lives and, perhaps worse yet, on their trust

10    in the safety of the water coming from their taps.

11         But the crisis passed.  We have no reason to believe that

12    problems related to the water crisis linger in our taps.  And I

13    have no evidence before me that MCHM, while perhaps an immediate

14    irritant, represents a long-term health threat to anyone.

15         I've struggled, as I've said before, with the sentencing

16    decision in these cases as much as any case I've ever had, all

17    the more so in your case.  There are many facets of this case

18    pulling the sentencing decision in different directions.

19         While there's no doubt that causing a discharge of a

20    pollutant chemical into the water supply is a very serious

21    offense requiring a just punishment, I cannot ignore the fact

22    that these charges are misdemeanors and not based on intentional

23    conduct but, at most, negligence -- carelessness in layman's

24    terms -- in Count Three, and even less in Count Two, which

25    charges strict liability and, therefore, no level of intent under

the Refuse Act.  Further, I note in Count Three, negligent
violation of a permit, is obviously related to the circumstances
leading to the spill of MCHM, but requires no proof of a spill to
establish that crime.

Negligence is an unusual foundation for a federal criminal
statute.  Generally, the legal system relies on lawyers bringing
civil litigation to remedy and deter negligence.

Further, we handle few misdemeanors in federal District
Court.  Of the hundreds of criminal cases over which I have
presided in nearly ten years, I would estimate that less than ten
of those have been misdemeanors before now.  Of those, I can only
recall one -- a political or Government corruption case -- in
which I gave prison time.  In the eyes of the legal system, a
misdemeanor charge limits the seriousness of the crime and must
necessarily limit the punishment, as well.

The federal sentencing guidelines recognize this distinction
specifically in relation to these very crimes.  The guideline
calculation which governs these cases is based by the explicit
terms of the guidelines themselves on knowing and, therefore,
intentional misconduct.  If the evidence against you and the
other defendants had reflected intentional misconduct, you would
all likely be facing the relatively lengthy prison terms the
guidelines otherwise call for.  However, since they are
misdemeanors and not based on knowing conduct, the guidelines
suggest a downward departure -- for a negligence case, all the

1    more so for a strict liability crime.  The problem for me is they

2    do not recommend how much of a departure should be considered.

3    Thus, the guidelines are frankly of little use in fashioning a

4    sentence in this case.

5        It is likewise difficult to find information on prior

6    sentencings in Clean Water Act and Refuse Act misdemeanor cases

7    to use as a starting point for a sentencing decision.  However, I

8    was shown information in the Burdette case that last year,

9    nationwide, 67% of all environmental and wildlife cases got

10   probation only.  That percentage was similar -- I checked -- for

11   the previous two years, as well.  That number includes all such

12   crimes, presumably both felonies and misdemeanors.  In those

13   circumstances, one would expect that the proportion of

14   misdemeanors receiving probation would be even greater.  I

15   received information and provided to both sides today from the

16   Sentencing Commission that indicated that more than 90% of these

17   misdemeanors get either a fine only or probation only.

18       Perhaps even more instructive is information you've

19   confirmed in the prosecutions arising outs of the oil spill in

20   the Gulf of Mexico from the BP deepwater Horizon.  That was

21   obviously a calamity that vastly eclipses this case in terms of

22   both environmental and economic impact.  Five individuals have

23   been prosecuted in that case.  One was acquitted of

24   obstruction-related felony charges, and two others pled guilty to

25   similar felony charges, and neither of them received prison

sentences.  Two others were charged with manslaughter charges
relating to the eleven deaths that occurred on the platform, as
well as negligent Clean Water Act violations, similar to those in
this case.  The manslaughter charges were dismissed.  One
defendant is pending trial on the remaining negligent Clean Water
Act charge.  The other pled to a negligent Clean Water Act charge
and is pending sentencing, but the Government and defendant
agreed to a binding sentencing recommendation of ten months of
probation.

As most of you are aware, I had a hearing to sort through
some issues regarding the factual basis for this and other cases
about two weeks ago.  As I explained then, I take the requirement
that I find a factual basis for every legal element, the
components of the charge, very seriously.  I closely studied and
wrestled with the factual basis in these cases because the
charges are complicated.  Frankly, I have little experience in
environmental issues and these cases have required some
stretching and tugging on both the facts and the law to find a
factual basis in this case.

For example, to find a factual basis on the Refuse Act, I
had to find that the responsible corporate officer doctrine
applies, even though no court in the country has ever so held in
a criminal case.

Another example is that there is no guarantee that putting
these plans in place at Etowah would have prevented this leak.

1    There's no way to know for sure because it never happened.  This

2    is weight on me as I have considered this sentencing decision.

3        By the way, this is not a criticism of the work of the

4    prosecutors.  Even the best lawyers must play the factual hand

5    that they are dealt.  The lawyers on both sides have obviously

6    worked hard and sweated the details to bring about an appropriate

7    resolution of these charges, even as they have effectively

8    advocated for their respective clients.

9        This defendant is hardly a criminal.  He has negligible

10   criminal history and has been a businessman most of his life.

11   His crimes are those of careless omission.  He poses little

12   threat to the public and I find little need to deter him from

13   further crime with this sentence.

14       Most sentencing factors under Section 3553(a), particularly

15   those related specifically to this defendant and these particular

16   crimes, tend to suggest that no prison time is necessary in this

17   case.  However, deterrence of others and, by extension, promoting

18   respect for environmental laws, is also an extremely important

19   consideration.  First, I note that the prosecution itself will

20   likely have a significant deterrent effect, not to mention the

21   resulting damage to reputation, large bills from lawyers, and the

22   anxiety of facing justice before a judge, aside from an onslaught

23   of civil litigation.

24       Potential polluters should take note of what happens even

25   when you first turn a blind eye to environmental issues, not to

1    mention polluting intentionally.  Thus, the efforts of the

2    Government and the investigative agencies in these cases have

3    already created a deterrent to this sort of conduct.  Of question

4    for me today is what sentence is sufficient, but not greater than

5    necessary to complete the deterrent message of this prosecution?

6         It is apparent to me now that the problem with Freedom

7    Industries was probably a mixture of misplaced priorities and

8    incompetence.  You hired an environmental guy who had no clue how

9    to make sure a facility like Etowah was properly run from an

10   environmental standpoint and relied on him way too much.  That

11   was a recipe for disaster.

12        On the other hand, apparently in part because of a surprise

13   EPA inspection around 2011, you got it relatively right at Poca

14   Blending.  That inspection resulted in the implementation of a

15   Spill Prevention Control and Countermeasures Plan.  Further, at

16   least by 2013, you had both a Stormwater Pollution Prevention

17   Plan and a Groundwater Protection Plan in place at Poca Blending.

18   Yet, you had none of these at Etowah, even though all were

19   required, it turns out.  These are not helpful facts for you.

20        Ultimately, you were the President.  It was all your

21   responsibility, along with the other owners, and you failed.

22   What I must decide is what I need to do to get the attention of

23   any other Dennis Farrells out there who may need some incentive

24   to straighten up and get it right.

25        Is probation and a large fine sufficient to deter others

1  from this kind of careless treatment of the environment?  Or is

2  the reality of time in custody, even with all the other

3  consequences that these cases require -- even with all the other

4  consequences of these cases required to have the appropriate

5  deterrent effect?  These questions candidly have vexed me for

6  weeks.

7      As I wrote those words last night, I had not decided if

8  prison would be a part of this sentence or not.  By morning, I

9  had realized that the answer was contained in what I had already

10  written.  You had these plans in place at Poca Blending, but not

11  Etowah.  An inspection by the EPA in 2011 at Poca Blending did

12  not bring attention to these things sufficiently to correct the

13  lack of plans at Etowah.  One would hope that an interaction with

14  the EPA that ended up costing quite a bit of money, even though

15  it related to a different site and a different type of plan,

16  would cause you to think, "I had better make sure my business is

17  fully compliant with all the environmental regulations."  But

18  that's not what has happened.

19      I know it was not intentional.  It was a mistake, a

20  negligent mistake with big consequences; but, obviously, more is

21  required to focus others similarly situated, the other Dennis

22  Farrells of the world, on the necessary actions to be taken.

23  I, therefore, conclude that probation is an ineffective incentive

24  and deterrent.  Some time in custody is needed to deter this

25  conduct and promote respect for environmental laws.

1     It is, therefore, based on these factors the judgment of

2   this Court that you be committed to the custody of the Federal

3   Bureau of Prisons for one month, 30 days.  This is a departure

4   under Section 2Q1.3, Application Note 3.

5     Upon release from prison, you shall be placed on supervised

6   release for a term of six months.

7     Within 72 hours of release from custody, you shall report in

8   person to the U. S. Probation Office in the district to which you

9   are released.

10     While on supervised release, you must not commit another

11   federal, state or local crime and you must not unlawfully possess

12   a controlled substance.

13     You also must comply with the standard terms and conditions

14   of supervised release as recommended by the U. S. Sentencing

15   Commission and as adopted by this Court, except that you need not

16   participate in a program of testing, counseling and treatment for

17   drug and alcohol abuse, as that does not appear to be implicated

18   in your case.

19     You must also abide by the special conditions of supervised

20   release as set forth in the local rules of this Court.

21     I will also not include a drug testing requirement.

22     I am going to impose and hereby fine you in the amount of

23   $20,000.00.  That will -- if that is not paid within 15 days of

24   today, it must be -- interest will begin to accrue on the fine

25   amount.  It will be a special condition of your supervised

1    release that you pay the fine, if you haven't already.  The main

2    reason I'm imposing supervised release is to make sure that the

3    fine is paid.

4         Along those lines then, I will also add two additional

5    conditions to your supervised release, and that is, first, that

6    you shall be required to provide the probation officer -- provide

7    the probation officer access to any requested financial

8    information; and, second, you shall pay all monies received from

9    income tax refunds, lottery winnings, judgments, and any other

10   anticipated or unanticipated financial gains to the fine

11   obligation.

12        I note that the special assessment has already been paid.

13        You may be seated.

14        Mr. Wright, I believe, with regard to this defendant, one

15   count remains pending, and that is Count One; is that correct?

16             MR. WRIGHT:  That's correct, Your Honor.

17             THE COURT:  And is there a motion with regard to that

18   count?

19             MR. WRIGHT:  Your Honor, the United States moves to

20   dismiss Count One as to Dennis Farrell.

21             THE COURT:  That motion will be granted.

22        Mr. Carey, I am going to include in my J&C not just a

23   recommendation, but an order that the defendant shall not be

24   housed in a -- or designated to a state facility.  I learned in

25   looking into this this afternoon that, sometimes, with short

1    sentences like this, it's possible that the Bureau of Prisons

2    could designate him on a contract basis to a state facility and

3    they -- the Bureau of Prisons designation senator assures me if I

4    order that they not do that, that he will be designated to a

5    Bureau of Prisons facility and not state facility.

6         Having said that, are there any recommendations then that

7    you or your client would like for me to make to the Bureau of

8    Prisons?

9              MR. CAREY:  Yes, Your Honor, that he be sent to a

10   camp-type facility because of the nature of the crime and the

11   shortness in duration of the sentence.  He doesn't pose a danger

12   to society, so he doesn't need to be held in anything above a

13   camp level, and ask that it be within a relative distance of his

14   home.  There's several camps within the area now, and I would ask

15   that it be within reasonable proximity, and that he be allowed to

16   self-report at the time and place that the Bureau of Prisons

17   designates.

18             THE COURT:  I will -- I think the closest camp is

19   actually at Beckley.

20             MR. CAREY:  Yes.  I'm not sure anymore.  I think there

21   is one there.

22             THE COURT:  Mr. Lambert?  Or maybe I should ask the

23   marshals.

24             USDM INGRAM:  Your Honor, to my understanding, Beckley,

25   Ashland, Morgantown, they would all have camps.

1            THE COURT:  All right.  Well, I will recommend that the

2    defendant be designated to a camp facility as close to his home

3    in Charleston as possible.  With regard to self-reporting, does

4    the Government have any objection to that?

5            MR. WRIGHT:  No, Your Honor.

6            THE COURT:  All right.  I will allow the defendant to

7    self-report to serve his sentence as directed by the United

8    States Marshal Service.

9        Mr. Farrell, you have the -- there's a significant appeal

10   waiver contained in your plea agreement.  As qualified by that

11   waiver, you have the right to appeal the judgment of this Court.

12   Any Notice of Appeal must be filed with the Clerk not more than

13   14 days from the date of the entry of the judgment order.

14       If you desire counsel on appeal and you are unable to retain

15   counsel, the appropriate Court will review a financial affidavit

16   filed by you to determine whether or not to appoint counsel.

17       Do you understand your right to appeal and the 14-day filing

18   requirement?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  I will place the Presentence Report under

21   seal subject to counsel's right to unseal as necessary for

22   appeal.

23       Any other matters we need to take up in this case?

24           MR. WRIGHT:  No, Your Honor.

25           MR. CAREY:  No, Your Honor.

1           THE COURT:  All right.  Thank you.

2       (Proceedings concluded.)

3

4    CERTIFICATION:

5       I, Ayme A. Cochran, Official Court Reporter, certify that

6    the foregoing is a correct transcript from the record of

7    proceedings in the matter of United States of America, Plaintiff

8    v. Dennis P. Farrell, Defendant, Criminal Action No.

9    2:14-CR-00264-1, as reported on February 11, 2016.

10

11   s/Ayme A. Cochran, RMR, CRR                    February 15, 2016

12   Ayme A. Cochran, RMR, CRR                      DATE

13

14

15

16

17

18

19

20

21

22

23

24

25